UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) Cause No. 1:21-cr-49-SEB-DLP | |
| KRYSTAL CHERIKA SCOTT, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by counsel, John E. Childress, Acting United States Attorney for the Southern District of Indiana, and Tiffany J. Preston, Assistant United States Attorney, hereby files its Sentencing Memorandum in the matter of the *United States v. Krystal Cherika Scott*.

I. **PROCEDURAL HISTORY**

On July 15, 2020, Krystal Cherika Scott ("Ms. Scott" or the "defendant") was charged in a two-count Criminal Complaint with animal crushing, in violation of 18 U.S.C. § 48(a)(1). On July 16, 2020, the defendant was arrested, appeared in federal court, and was detained pending future proceedings. On February 3, 2021, the Court held a detention hearing, and Court ordered Ms. Scott to be detained.

On February 17, 2021, the Grand Jury returned a two-count Indictment charging Ms. Scott with animal crushing, in violation of 18 U.S.C. § 48(a)(1), on or about June 13, 2020 and June 18, 2020.

On May 18, 2021, the parties filed a Petition to Enter Plea of Guilty and Plea Agreement. According to the terms of the agreement, the defendant will plead guilty to Counts 1 and 2 of the Indictment. The parties have not agreed upon a specific sentence. However, the Government has agreed to recommend a sentence within the advisory guideline range found by the Court, provided that the defendant continues to fully accept responsibility for the offense and does not commit a new criminal offense before the date of any sentencing. Under the agreement, Ms. Scott may argue for any sentence. The parties have not agreed upon the length or conditions of any term of supervised release, and the imposition of a fine is left to the discretion of the Court.

## II. BRIEF LEGISLATIVE HISTORY OF TITLE 18, UNITED STATES CODE, SECTION 48

Title 18, United States Code, Section 48 has had four major revisions, the last of which added § 48(a)(1), the provision to which defendant will plead guilty. Because Congress enacted Section 48(a)(1) after the last revision to the United States Sentencing Guidelines in 2018, and Ms. Scott was the first defendant to be charged under the new provision of the Act, the Government has provided a brief summary of the history of Section 48 for relevant context.[1]

Section 48 was first enacted in 1999. It then defined "animal cruelty" as conduct "in which a living animal is intentionally maimed, mutilated, tortured,

---

[1] The government is aware of only one other case in which a defendant has been convicted and sentenced for a violation of animal crushing under § 48(a)(1) – *United States v. Angel Ramos-Corrales*, ED CR No. 21-123-JFW, Central District of California. The Government will address that case below.

wounded, or killed," and made it a federal crime to knowingly create, sell, or possess a depict animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain, with certain exemptions. 18 U.S.C. § 48 (1999) (emphasis added). The Supreme Court later ruled § 48 to be unconstitutional in *United States v. Stevens*, 559 U.S. 460 (2010). In that animal fighting video case, the Supreme Court held that § 48 was substantially overbroad and included the prohibition of protected speech under the First Amendment. *Id*. at 480-81. Importantly, the Court reserved the question of "whether a statute limited to crush videos or other depictions of extreme animal cruelty would be constitutional." *Id*. at 482.

In the wake of *Stevens*, Congress passed the Animal Crush Video Prohibition Act of 2010 ("ACVPA"). The ACVPA revised § 48 and prohibited creating and distributing "animal crush videos" whose definition now included "obscene." In the formal findings of the 2010 version of the Act, Congress made an explicit tie between animal cruelty and obscenity (as defined by *Miller v. California*, 413 U.S. 15 (1973)) in prohibiting creating and distributing animal crush videos. *Id*. Congress further found that the federal government has "a compelling interest in preventing intentional acts of extreme animal cruelty." ACVPA, Pub. L. No. 111-294 (Dec. 9, 2010). The ACVPA's revised prohibitions of creating and distributing animal crush videos are currently set forth in §§ 48(a)(2) and (3), and the revised definition of "animal crush video" is found in § 48(f)(2).

In *United States v. Richards*, the defendant challenged the constitutionality of the ACVPA in the Fifth Circuit. 755 F.3d 269 (5th Cir. 2014). In that case, the defendant's creation of the animal crush video was for a sexual purpose. The Fifth Circuit held that § 48 prohibits creating and distributing "obscene" content as defined in *Miller* "and thus by its terms proscribes only unprotected speech." *Id*. at 276, cert. denied, 575 U.S. 915 (2015). To date, no other circuit has considered the constitutionality of § 48 as amended by ACVPA.

Finally, in 2019, Congress enacted the Preventing Animal Cruelty and Torture ("PACT") Act to add a new provision to § 48 to prohibit the animal crushing conduct itself and pointed to the existing definition of "animal crushing" that did not include "obscene." Pub.L. No. 116-72 (Nov. 25, 2019). The PACT Act's prohibition is now codified at § 48(a)(1), the provision to which defendant will plead guilty. The definition of "animal crushing" (with no reference to "obscene") is found at § 48(f)(1).

The House of Representatives floor speeches in the lead-up to the vote on the PACT Act illustrate the close connection between prohibiting animal crushing and the creating and distributing animal crush videos, while highlighting the differences between the underlying cruelty conduct and creating images or videos depicting it. Those statements by a bipartisan group of legislators reveal that Congress' intent in adding the current § 48(a)(1) was: (1) to criminalize the animal cruelty conduct connected to, but preceding and/or underlying the creation and distribution of animal crush videos, with or without the presence of videos; (2) to give federal law enforcement broader authority to combat animal cruelty conduct; (3) to give federal

4

law enforcement ability to investigate animal cruelty conduct discovered while investigating other federal crimes; and (4) criminalize individuals conducting interstate commerce of animal breeding and sales if they engage in acts of animal cruelty. *See* 165 Cong. Rec.H8356-H8358 (daily ed. Oct. 22, 2019) (statements of Reps. Deutch, Reschenthaler, Axne, Fitzpatrick, Blumenauer, Stevens). Furthermore, the signing statement made by then-President Donald Trump highlighted the PACT Act's key purpose: "It is important that we combat these heinous and sadistic acts of cruelty, which are totally unacceptable in a civilized society." "President Trump Signs Preventing Animal Cruelty and Torture Act, Nov. 25, 2019," available at https://trumpwhitehouse.archives.gov/briefings-statements/remarkspresident-Trump-signing-ceremony-h-r-724-preventing-animal-crueltytorture-pact-act/.

Ms. Scott has been indicted, and intends to plead guilty to two counts of animal crushing under Section 48 (a)(1). Incidentally, Ms. Scott also created and distributed videos depicting animal crushing. She has not been charged with that conduct, however, given the obscenity requirement in the definition connected to (a)(2).

### III.   THE PRESENTENCE INVESTIGATION REPORT

On July 12, 2021, the United States Probation Office ("USPO") disclosed the Presentence Investigation Report ("PSR"). (Dkt. 45.) The PACT Act was enacted after the release of the 2018 version of the Sentencing Guidelines, and the USPO determined that USSG Appendix A's reference to USSG § 2G3.1 for 18 U.S.C. § 48

5

still applies.[2] Using § 2G3.1, the USPO calculated defendant's total offense level, criminal history category, and Guidelines range as follows:

**Base Offense Level:** The guideline for a violation of 18 U.S.C. § 48(a)(1) is found in USSG §2G3.1(a) and calls for a base offense level of 10.   **10**

**Specific Offense Characteristics:** The defendant knowingly engaged in distribution. Pursuant to USSG §2G3.1(b)(1)(F), two levels are added. **+2**

**Specific Offense Characteristics:** The offenses involved the use of a computer or interactive computer service. Pursuant to USSG §2G3.1(b)(3), two levels are added. **+2**

**Specific Offense Characteristics:** The offenses involved material that portrays depictions of violence. Pursuant to USSG §2G3.1(b)(4), four levels are added. **+4**

**Victim Related Adjustment:** None. **0**

**Adjustment for Role in the Offense:** None. **0**

**Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense; therefore, two levels are added. USSG §3C1.1. **+2**

**Adjusted Offense Level (Subtotal): 20**

**Chapter Four Enhancement:** None. **0**

**Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). **-2**

**Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b). **-1**

---

[2] This calculation was accepted by the Court in the *United States v. Angel Ramos-Corrales* case referenced above the Honorable John F. Walter of the Central District of California.

**Total Offense Level: 17**

**Statutory Provisions:** Counts 1 and 2: The maximum term of imprisonment is seven years per count. 18 U.S.C. § 48(c).

**Guideline Provisions:** Based upon a total offense level of 17 and a criminal history category of I, the guideline imprisonment range is 24 to 30 months.

**Supervised Release**
**Statutory Provisions:** Counts 1 and 2: The Court may impose a term of supervised release of not more than three years per count. 18 U.S.C. § 3583(b)(2). Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

**Guideline Provisions:** Counts 1 and 2: Since the offenses are Class D Felonies, the guideline range for a term of supervised release is 1 to 3 years. USSG §5D1.2(a)(2).

The Government agrees with the USPO's determination of the defendant's total offense level and criminal history category calculation. The Government has no objection to the PSR.

    **IV.**   **A SENTENCE OF IMPRISONMENT WITHIN THE GUIDELINE RANGE IS REASONABLE AND APPROPRIATE UNDER TITLE 18, UNITED STATES CODE, SECTION 3553(a)**

    A. <u>Ms. Scott's Offense Conduct</u>

The defendant, Krystal Cherika Scott, was a resident of Kokomo, Indiana, which is in the Southern District of Indiana. Person 1 was a resident of the Northern District of Indiana, and was the owner of a living and healthy, non-human animal, namely, a domestic, pregnant cat. Person 2 was a resident of the Southern District of Indiana, and was the owner of a living and healthy, non-human animal, namely, a domestic kitten. On the dates set forth below, Persons 1 and 2 placed advertisements on Social Media Application A to find a person to take possession of and permanently care for the pregnant cat and kitten, respectively. Defendant used Social Media

Application A to respond to Person 1's and 2's advertisements. Using Social Media Application A, Defendant use trickery and deceit to induce Persons 1 and 2 to tender possession of their domestic animals to Defendant. Namely, Defendant used Social Media Application A to falsely assert that she intended to properly care for the animals and keep them as domestic pets. During Defendant's communications over Social Media Application A to Persons 1 and 2, Defendant used the chat feature to inquire about the health of the animals, and referred to the animals as "baby," "cuties," or "furbaby" to make it appear as though she intended to care for the animals as pets. Using Social Media Application A, Defendant falsely told Person 1 that she would spoil the cat, and Person 1 affirmed that she would love that. Using Social Media Application A, Person 2 told Defendant that all of the kittens were cute, but that they were becoming too much to handle.

Persons 1 and 2 relied on Defendant's false assertions, and agreed to tender possession of their domestic animals to Defendant. Defendant used Social Media Application A to provide a date, time, and location to take possession of the animals from Persons 1 and 2.

In or about June 2020, Defendant took possession of Person 1's pregnant cat, and Person 2's kitten within the Southern District of Indiana. Through Social Media Application A, Persons 1 and 2 gained a person whom they believed would be a willing caregiver for their pets, and who would assume the cost of said caregiving. Through Social Media Application A, Defendant gained possession of the animals she desired

to crush. Rather than properly care for the animals as domestic pets, defendant engaged in Animal Crushing, as set forth below.

Defendant used Social Media Application B to post images and videos depicting her acts of Animal Crushing on the internet either during, via live stream, or after her acts of animal crushing occurred. Defendant reacted to comments on Social Media Application B by, for example, providing dates and times of crushing animals and posting pictures of the animals alive before sharing pictures and videos of the animals after they had been crushed.[3]

Social Media Applications 1 and 2 are online social media platforms that deliver communications through an interstate infrastructure. Advertisements placed on the Internet through social media are communications delivered through an interstate infrastructure and are in or affecting interstate commerce.

Defendant used Social Medica Application A to engaged in commerce, by trading, bartering, and engaging in a system of exchange. Namely, Persons 1 and 2 benefitted from finding a caregiver they believed would care for and feed their domestic animals, when they could not, and Defendant gained possession of domestic animals that she needed to engaged in Animal Crushing, and received notoriety by posting her illegal acts on Social Media Application B. The Defendant committed Counts 1 and 2 in the Southern District of Indiana.

---

[3] The United States has submitted exhibits under seal depicting screen shots of only a few of the videos created by Ms. Scott. The images include Ms. Scott's statements to her followers on the social media application, and show the heinous and cruel nature of her acts which is relevant under the nature and circumstances of the offense, and Ms. Scott's character.

Accordingly, on or about the dates listed below in each separate Count, in the Southern District of Indiana and elsewhere, Krystal Cherika Scott, the defendant, engaged in animal crushing of a living non-human mammal in or affecting interstate or foreign commerce, as described further in each Count.

| Count | Date of Animal Crushing Act | Interstate Infrastructure Through which Scott Engaged in Commerce | Description of the Animal Crushing Act |
|---|---|---|---|
| 1 | June 13, 2020 | Social Media Application A | Defendant asphyxiated the pregnant cat she acquired from Person 1 by placing a ligature around its neck, and strangling the cat until it died. Defendant then removed the unborn kittens from inside the cat's body, and used Social Media Application B to post a series of images depicting the animal crushing act. |
| 2 | June 18, 2020 | Social Media Application A | Defendant asphyxiated the kitten she acquired from Person 2's by placing a ligature around its neck, and hanging the ligature from a fixed object until it died. Defendant then used Social Media Application B to post a video depicting the animal crushing act, stating, "Little shit was still alive so rehanged it." |

In total, the Defendant crushed approximately five dogs, five cats, and 11 unborn kittens. The United States has submitted under seal as Group Exhibit A six screen shots from various videos depicting animal crushing that were created and uploaded by Ms. Scott.

B. <u>The Nature and Circumstances of the Offense</u>

The nature and circumstances of defendant's offense are aggravating and point to a sentence within Guideline Range and against a variance below it. See 18 U.S.C. § 3553(a)(1). Ms. Scott's crimes were intentional, deliberate act of sadistic cruelty that spanned at least several months, and included the intentional killing and torture of multiple animals as well as the uploading of numerous videos on social media. Defendant's conduct was not one borne of momentary rage or spontaneous burst of violence in a fit of passion. Rather, and as depicted in the images taken from videos filed under seal with the Court, Ms. Scott's crimes took careful and deliberate planning and time. She first had to acquire the animals under false pretenses, set up a scene to prepare for their torture, announce and advertise her videos over social media, and then slowly and cruelly torture and kill the animals. She then had to upload the images and videos online. Ms. Scott appeared to revel heartlessly in exacting mortal wounds to the animals, and gave no aid to them. She appears to have been motivated by the online attention she received, and her actions no doubt created a sense of acceptance and normalcy to the cruel behavior.

C. <u>History and Characteristics</u>

In aggravation, on May 20, 2021, officers in the Hamilton County Jail received information from the defendant's cellmate that the defendant, on multiple occasions, described her case and what she did to cats in detail. Further, the defendant brought in a moth from outdoor recreation and smashed it with her hands. The cellmate requested to move cells. Given this conduct took place after her arrest and

11

incarceration, the Government believes it is relevant to her risk of recidivism and lack of remorse for her conduct.

In mitigation, the defendant has a tragic history that is set forth in the PSR. She also has a history of mental and emotional health issues for which she has received inadequate treatment to date. The defendant is in need of serious mental health treatment, and can receive that while incarcerated at the BOP and during her period of supervised release. Without it, and particularly given her behavior in jail after her arrest, the United States believes she is a serious risk of recidivism.

D. <u>Adequate Deterrence and Protection from Future Crimes</u>

A sentence within the applicable Guideline Range as calculated by the Court at sentencing is appropriate to provide adequate specific and general deterrence and protection of the public from Ms. Scott's future crimes. See 18 U.S.C. §§ 3553(a)(2)(B), (C). As Congress has found, the federal government has "a compelling interest in preventing intentional acts of extreme animal cruelty." ACVPA, Pub. L. No. 111-294. As Representative Haley Stevens spoke on the House floor in 2019, a key purpose of the PACT Act is "to stop animal abuse on the front end and also stop other forms of domestic abuse that may arise from it." 165 Cong. Rec. H8357 (statement of Rep. Stevens). A just sentence will help achieve the legislative goals of § 48(a)(1) to deter both defendant herself and others in the community from committing similar acts of extremely cruelty and abuse of domestic animals.

A report on the connection between serial killers and animal abusers noted that, "Acts of cruelty to animals are not mere indications of a minor personality flaw

in the abuser; they are symptomatic of a deep mental disturbance. Research in psychology and criminology shows that people who commit acts of cruelty to animals don't stop there – many of them move on to their fellow humans." *Id.*; quoting Daniel Goldman, "Experts See Parallels Between Dahmer, Previous Serial Killers," New York Times News Service, Aug. 11, 1991 ("'Murderers like this very often start out by killing and torturing animals as kids,' says Robert K. Ressler, who developed profiles of serial killers for the Federal Bureau of Investigation's behavior sciences unit.").

As other studies into the link between cruelty toward animals and behavior toward other human beings have shown, "people who abuse animals are five times more likely to commit violent crimes against humans." Jared Squires, "The Link Between Animal Cruelty and Human Violence: Children Caught in the Middle," 8 Ky. Child. Rts. J. 2, (2000). Also, studies focusing specifically on sex offenders found that "48% of rapists and 30% of child molesters admitted to acts of animal cruelty in childhood or adolescence." *Id.* at 5. As a court discussing the same studies in a dog-fighting case observed, "The connection between animal abuse and the effect on children is undeniable, simply view a list of recent serial killers to find that generally their first victims were usually animals." Court's Sentencing Memorandum, *United States v. Berry*, No. 09-CR-30101-MJR, at 17 (S.D. Ill. May 11, 2010), ECF No. 157. See also U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention, "Animal Abuse and Youth Violence," Juvenile Justice Bulletin (Sept. 2001), available at https://www.ojp.gov/pdffiles1/ojjdp/188677.pdf (summarizing studies suggesting that animal abuse may be characteristic of up to nearly two in

13

three violent adult offenders). Although animal cruelty does not necessarily mean future violent behavior toward other people, the high correlation points to a need for heightened attention to deterrence, public safety, and a full term of supervision after imprisonment.

In light of the United States' compelling interest in protecting domestic animals from extreme cruelty as well as the public from the future crimes of defendant who bears a number of significant risk factors, the Government is asking this Court to consider imposing a sentence within the applicable Guideline Range, followed by a three-year term of supervised release. In addition, the government believes that a mental health evaluation and treatment condition be imposed as a special condition of supervised release.

    E.    *United States v. Ramos-Corrales*

The Government is aware of only one defendant who has been convicted and sentenced under this new version of the act. On November 1, 2021, and in *United States v. Angel Ramo-Corrales*, the Honorable John F. Walter sentenced Mr. Ramos-Corrales to 24 months in prison and 2 years of supervised release. Mr. Ramos-Corrales' sentencing Guideline range was 18-24 months. Mr. Ramos-Corrales tortured and killed one animal, and created and uploaded one video of it.

### V. <u>CONCLUSION</u>

WHEREFORE, and for the foregoing reasons, the United States respectfully requests that the Court sentence Krystal Cherika Scott to a term of imprisonment at within the applicable Guideline range as calculated at sentencing.

Respectfully submitted,

JOHN E. CHILDRESS
ACTING UNITED STATES ATTORNEY

By: */s/ Tiffany J. Preston*
Tiffany J. Preston
Assistant United States Attorney
10 W. Market St., Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333
Email: Tiffany.Preston@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2021, a copy of the foregoing GOVERNMENT'S SENTENCING MEMORANDUM was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.